IN THE CIRCUIT COURT,
FOURTH JUDICIAL CIRCUIT,
IN AND FOR CLAY COUNTY, FLORIDA

CASE NO.:  2017-CA-000507

DIVISION:  E

**AANYA HOSPITALITY, INC.,**
a Florida corporation,

   Plaintiff,

vs.

**CENTENNIAL BANK**,
an Arkansas banking corporation,

   Defendant.

_____/

## COMPLAINT

  Plaintiff, Aanya Hospitality, Inc., a Florida corporation ("Aanya"), sues defendant, Centennial Bank, an Arkansas banking corporation ("Centennial"), and alleges:

### Allegations Common to All Counts

  1. This is an action for damages which exceed the sum of $15,000 exclusive of costs and attorney's fees.

  2. Plaintiff Aanya is a Florida corporation which maintains its principal place of business in Clay County, Florida.

  3. Defendant Centennial is an Arkansas banking corporation qualified to do business in the State of Florida which maintains its principal place of business in Conway, Arkansas.

  4. Venue in this action is proper in Clay County, Florida because of a contractual forum selection clause in the construction loan agreement between the parties and also because the causes of action hereinafter alleged arose and accrued in Clay County, Florida.

5.       Prior to 2013, Aanya undertook to develop and construct a Hampton Inn hotel in Orange Park, Clay County, Florida (the "Project").

6.       On or about May 30, 2013, Centennial agreed to provide construction financing for the Project pursuant to the terms of a Construction Loan Agreement, a copy of which is attached hereto as **Exhibit "A"**.

7.       The original Construction Loan Agreement was subsequently amended by that certain First Amendment to Construction Loan Agreement dated December 4, 2014, that certain Second Amendment to Construction Loan Agreement dated August 25, 2015, that certain Third Amendment to Construction Loan Agreement dated September 17, 2015, that certain Fourth Amendment to Construction Loan Agreement dated February 16, 2016, and that certain Fifth Amendment to Construction Loan Agreement dated August 17, 2016, copies of which are attached hereto as **Composite Exhibit "B"** (the "Amendments").

8.       Pursuant to the Amendments, the "Completion Date" for the Project was ultimately extended until October 17, 2016.

9.       Pursuant to the terms of the Amendments, Aanya waived any loan related claims or defenses through February 16, 2016, but did not waive any loan related claims or defenses thereafter.

10.      Under its Construction Loan Agreement, Centennial agreed to lend Aanya the sum of $6,000,000.00 toward the acquisition and construction of the Project.

11.      Simultaneously with Centennial's Construction Loan Agreement, Mercantile Capital Corporation, a Florida corporation ("Mercantile"), as a second mortgage lender, agreed to loan Aanya the additional sum of $3,600,000.00 toward the acquisition and construction of the Project.  (Centennial and Mercantile being referred to hereafter collectively as the "Lenders")

12.    On or about May 30, 2013, Aanya, Centennial, Mercantile, and the Lenders' designated funds administrator, Tetra Tech, Inc. ("Tetra Tech"), also entered into a Construction Coordination Agreement, a copy of which is attached hereto as **Exhibit "C"** (the "Coordination Agreement"). Plaintiff does not have a fully executed copy of the Coordination Agreement in its possession but will supplement this complaint with such a copy when received.

13.    Pursuant to the terms of the Coordination Agreement, defendant Centennial, among other things, agreed as follows:

A.    Interim Lender [Mercantile] will coordinate the activities of the Third Party Inspector [Tetra Tech] and keep all parties hereto apprised of the status of construction and arrange discussions and meetings with the parties in the event situations arise which require consultation. (¶6)

B.    Neither Lender shall refuse to fully fund its Committed Amount unless there shall be a material, uncured default under its Loan Documents, Contractor has materially defaulted in the performance of its work on the Improvements, or the Lenders agree among themselves in writing to halt funding for completion of the Improvements. In the event of default, each Lender shall promptly provide written notice thereof to the other Lenders. (¶9)

C.    The Lenders acknowledge their joint relationship and mutual obligations created by and involved in a 504 Loan as set forth not only in the Authorization Number 50440050-07, but also in the pertinent SBA SOP regulations. The Lenders agree to timely fund the entirety of their loans and to manage their respective loans and relationship with each other and the Borrower in such a way that results in the SBA honoring its commitments as stated in the Authorization which, among other things, requires the SBA to guarantee a Twenty (20) year Debenture in the amount of $3,696,000.00 (the "Guarantee"), the result of which will be to satisfy Borrower's obligation to Interim Lender…. (¶10)

D.    In the event of a default by Borrower under any of the Loan Documents or a default by Contractor, or any material interruption of construction of the Improvements, Lenders agree to exercise good faith and due diligence in resolving the issues presented to the end that the construction of the Improvements is completed and a certificate of occupancy issued in due course. (¶12)

E.    In the event of a default by any party hereto under the terms of this Agreement, in addition to any other remedies which the nondefaulting party or parties may have hereunder, the nondefaulting party or parties shall have the right

to enforce this Agreement as against the defaulting party by specific performance or other appropriate equitable remedy.  (¶13)

14.    As a condition to their providing financing for the Project, and in lieu of payment and performance bonds, the Lenders required that Tetra Tech be engaged to control loan disbursements to the general contractor and to guarantee completion of the Project in the event of any default on the part of the general contractor.

15.    During July 2013, with the prior approval of the Lenders and Tetra Tech, Aanya engaged Coker Construction ("Coker") as its original general contractor for the Project.

16.    By early 2014, Aanya terminated Coker, with the Lenders' consent, because of Coker's failure to diligently prosecute the work.

17.    On or about February 24, 2014, with the Lenders' prior approval, Aanya engaged Commercial Construction, Inc. ("CCI") as the replacement general contractor.

18.    From approximately March 20, 2014, until May 31, 2015, CCI performed work on the Project as the general contractor.

19.    By May 31, 2015, CCI's work on the Project came to a standstill by reason of CCI's demand, as a condition to continue performance, that it be granted a large increase in the guaranteed maximum price for its services.

20.    On or about July 14, 2015, the Project architect certified that CCI was in substantial breach of its contract with Aanya justifying its termination as the general contractor.

21.    Within days after CCI's termination, the Lenders' funds control agent, Tetra Tech, acknowledged and assumed its responsibility to complete the Project in accordance with its contractual agreement with Mercantile as the lead lender and pursuant to the terms of the Coordination Agreement.

22.    Consistent with its role as the lead lender, Mercantile documented Tetra Tech's obligations as the "Completion Contractor" in the form of a "Takeover Agreement" that was executed on or about November 23, 2015, with the full knowledge and approval of both Lenders.

23.    With the full knowledge and approval of both Lenders, Tetra Tech thereafter employed WDG Group, Inc. ("WDG") as its subcontractor to complete the Project in accordance with the original plans and specifications.  With the full knowledge of both Lenders, WDG was employed on a cost-plus basis and with no budget, maximum contract price, or deadline for completion.

24.    By late February 2016, WDG claimed that the total cost to complete the Project might exceed the original CCI contract maximum price by more than $2,000,000.00 even though Tetra Tech had been regularly inspecting and approving CCI's prior pay applications and confirming to the Lenders that loan proceeds disbursed would not exceed the actual percentage of completion of the Project.

25.    During the time period after Tetra Tech assumed responsibility to complete the Project, defendant Centennial's representatives regularly participated in conference calls, status meetings, and owner/architect meetings to monitor and oversee progress of the work.  During the course of these meetings and conferences, defendant Centennial repeatedly reassured Aanya that Centennial intended to stand by Aanya through the completion of the Project and to exercise the type of influence contemplated by the Coordination Agreement to make sure that Mercantile and Tetra Tech likewise fulfilled their obligations to complete the Project.

26.    When it became apparent that the cost of completing the Project would substantially exceed the original guaranteed maximum price, Tetra Tech refused to fund the anticipated overages or complete the Project.  Even though Mercantile's attorneys, who drafted the Takeover Agreement, advised Tetra Tech that under the Takeover Agreement it was required

to complete the Project within the remaining amount of the existing construction loans, Tetra Tech defaulted and, ultimately by August 2016, completely stopped work on the Project.

27.    Because the Lenders' designated "Completion Contractor" failed to pay WDG for ongoing work, as of August 2016 numerous construction liens were filed by WDG's subcontractors and suppliers against the Project.

28.    During the time period from approximately August 1, 2016 until approximately December 29, 2016, plaintiff Aanya and the Lenders entered into discussions for further extension of the respective construction loans given the dilemma created by Tetra Tech's failure to perform its obligations as the Completion Contractor under the Takeover Agreement.

29.    Interim extensions of both loan agreements were negotiated pending negotiation of longer term extensions adequate for completion of the remaining work.

30.    By November 2016, Mercantile's counsel was circulating drafts of a proposed, 3-way "Recommencement Agreement" with counsel for both Aanya and Centennial in keeping with the Lenders' obligations under paragraphs 9, 10, and 12 of the Coordination Agreement.

31.    By December 1, 2016, it became apparent that defendant Centennial no longer considered itself bound by the obligations of the Coordination Agreement when, without prior warning, Centennial advised that it would consider a further extension for completion of the Project only if Aanya signed a separate agreement with Centennial without the participation of the lead Lender, Mercantile.

32.    Without prior warning, or justification under the circumstances, defendant Centennial then demanded as part of such separate agreement that plaintiff Aanya provide Centennial with a "Deficiency Deposit" of $1,880,855.32 in cash, payable in the sum or $1,300,000.00 immediately and the remaining balance within ninety (90) days.  Absent

agreement to these unilaterally imposed terms, Aanya was advised that Centennial would immediately institute foreclosure proceedings.

33.    Meanwhile, the second mortgage lender, Mercantile, consistent with the Coordination Agreement, continued to grant necessary extensions to its construction loan without any similar demands to those being made by Centennial.

34.    Due to Centennial's demand and threat of foreclosure, Aanya was left with no alternative but to accede or risk devastating financial loss.  On or about December 29, 2016, under threat of foreclosure, Aanya executed that certain Sixth Amendment to Construction Loan Agreement, a copy of which is attached hereto as **Exhibit "D"** (the "Sixth Amendment").  The Sixth Amendment was drafted by Centennial's counsel and was presented as a non-negotiable requirement for any further loan extensions.

35.    In anticipation of the additional funding requirements imposed by the Sixth Amendment, Aanya had already deposited with its attorney's trust account the sum of $949,968.95 to be applied toward the "Deficiency Deposit" defined in the Sixth Amendment. On or about the date of the Sixth Amendment, Aanya wired to Centennial out of those escrowed funds the sum of $374,116.57 that included prepaid interest for the next twelve (12) months under Centennial's construction loan.  As a result, Aanya had complied with all monetary terms of the Construction Loan Agreement and the Amendments, particularly including the Sixth Amendment.

36.    At all times during December 2016 leading up to the execution of the Sixth Amendment, Centennial's officers and agents verbally reassured Aanya's president and owner, Samir Patel, that provided he fund the additional deposit requirements out of his own pocket, that he could expect Centennial's good faith compliance with not only granting an additional twelve

(12) months to complete the Project, but would also disburse the remaining $1,221,230.00 under the existing Centennial loan.

37.     By its terms, the Sixth Amendment purported to eliminate Centennial's obligations under the existing Coordination Agreement, despite the fact that Mercantile had not consented to any such cancellation or rescission of the multi-party Agreement.

38.     On January 9, 2017, defendant Centennial returned an executed copy of the Sixth Amendment to Aanya for the first time.

39.     Before the Sixth Amendment had been fully executed, and unbeknownst to Aanya, Centennial had retained the services of a third-party inspection service, CCDI Inspection Services ("CCDI").  Over the Christmas holidays, CCDI and its team of inspectors appeared at the Project, began combing the Project, asking questions about the status of the work and demanding immediate production of voluminous construction documents, records, drawings, change orders, etc.

40.     During the same timeframe, on January 5, 2017, Centennial's chief lending officer demanded Aanya's immediate assembling and production of an exhaustive list of seventeen (17) categories of documents consisting of tens of thousands of pages.  Many of these documents had already been provided and the rest had been previously available to Centennial.

41.     By letter dated January 18, 2017, within a few days of the twelve (12) month extension of the construction loan, Centennial's attorneys formally notified Aanya that the Construction Loan Agreement was already in default "due to the borrower's failure to comply with its general terms requiring access and delivery of the Project Documents and access to the premises" all of which was false and unsubstantiated (the "First Default Notice").

42.     By letter dated January 25, 2017, Aanya's counsel responded on behalf of Aanya to Centennial's First Default Notice, providing numerous records previously provided or

available to Centennial through either Mercantile or Tetra Tech as contemplated by the Coordination Agreement.

43.     After reviewing Aanya's January 25, 2017, response to its First Default Notice, Centennial took no further action against Aanya in that regard.

44.     Paragraph 3(e) of the Sixth Amendment provides in pertinent part as follows:

> Borrower shall take immediate steps satisfy or bond off any and all construction and/or judgment liens encumbering the Property; Borrower is permitted to release proceeds from the Deficiency Deposit to satisfy and/or bond off such construction liens, provided that the proper releases/satisfactions, or evidences of surety or bond, are received upon such disbursement;….

45.     In keeping with the above provisions, since February 1, 2017, Aanya has repeatedly requested Centennial's approval for Aanya to use the escrowed Deficiency Deposit sums to pay off or bond off existing claims of lien against the Project.  Notwithstanding those repeated requests, and notwithstanding the absence of any payment defaults or other uncured technical defaults, Centennial failed and refused to allow such disbursements, jeopardizing not only the ability to resolve existing claims of lien (despite Centennials demands that Aanya do so) and the completion of the project itself.

46.     By letter dated March 2, 2017, approximately two (2) months after execution of the Sixth Amendment, Centennial once again declared Aanya to be in default, alleging various paperwork violations and relying upon the hastily compiled and fallacious CCDI inspection report attached thereto (the "Second Default Notice").  Despite its direct participation in the funding process for this Project from the beginning, and more intensive involvement after the Tetra Tech takeover, Centennial now insisted that all future funding for the Project was conditioned on strict observance of AIA payment protocol despite never imposing such requirements on Tetra Tech or WDG as the completing contractors (subcontractors) but nonetheless approving their funding requests.

47.     By letter dated March 10, 2017, Aanya's counsel replied to the Second Default Notice confirming a scheduled meeting on March 23, 2017, to discuss the latest Centennial demands and, in the meantime, providing documentation reflecting Aanya's compliance with the Deficiency Deposit requirements under the Sixth Amendment.

48.     In advance of the March 23, 2017, meeting, Aanya provided to Centennial a complete status report on all liens on the job and additional information addressing alleged corrective work needed according to the CCDI report.

49.     On March 23, 2017, representatives of Centennial and Aanya met in person and by conference call to discuss Centennial's latest demands in the Second Default Notice and the comments of their consultant in the CCDI report.  The project architect was also in attendance at this time by phone to respond to questions about the adequacy of the construction work to date. Aanya also provided a full report on the status of all liens and funds needed to pay off/reimburse for satisfaction of liens and funds needed for the ongoing work.  During the course of this meeting, Centennial maintained its refusal to allow disbursements from the escrow account for these purposes.

50.     By email later that same date, Aanya again reiterated that Centennial's refusal to allow use of the escrowed monies to pay for satisfaction or bonding off of liens was a violation of the express language of the Sixth Amendment.

51.     By email dated March 30, 2017, Aanya again demanded Centennial's permission to use its own escrowed funds for lien satisfaction and on-going work.

52.     By letter dated April 3, 2017, after receiving all of the information provided by Aanya, including the project architect's refutation of the CCDI report, Centennial notified Aanya for the third time that it was in default under the Construction Loan Agreement ("Third Default Notice").  Amazingly, the grounds for the Third Default Notice included additional "non-

monetary defaults" such as the failure to give the bank a copy of all building permits despite the fact that the Project had been underway since 2013.

53.     By letter dated April 25, 2017, a copy of which is attached hereto as **Exhibit "E"**, Aanya provided formal notice to Centennial under the terms of the original Construction Loan Agreement that the Sixth Amendment, purporting to include releases of claims and defenses available to Aanya was void *ab initio* by reason of Centennial's fraud in the inducement in connection with its execution.  Furthermore, in the alternative, Aanya notified Centennial that it had acted in bad faith in the manner in which it had manufactured one default after another immediately following execution of the Sixth Amendment.

54.     Subject to that formal default notice, Aanya made subsequent renewed requests for use of the escrowed monies to satisfy liens of record all of which were ignored in similar fashion as before.

55.     Aanya has retained the undersigned counsel and has agreed to pay them a reasonable fee for their services herein.

56.     All conditions precedent to the maintenance of the causes of action hereinafter alleged have been performed, have occurred, or have been waived by the conduct of the parties.

**COUNT I**
**(Fraud in the Inducement)**

57.     Plaintiff Aanya realleges the allegations of paragraphs 1 – 56 above and incorporates them by reference herein.

58.     At the time that Centennial procured the execution of the Sixth Amendment by Aanya, Centennial did not have the present intent to perform its obligations under the terms of that amendment.

59.     The truth of this allegation is supported by the following evidence:

A.      Even before the Sixth Amendment had been fully executed, Centennial had already employed an outside team of inspectors who were given a mandate to find anything and everything possibly wrong with the technical compliance of the Project despite the fact that, for the three (3) years before that date, Centennial had never imposed such unreasonable demands upon any previous contractor;

B.      Centennial intentionally based one of its claims of default (the "Second Default") on the CCDI report that was fraught with inaccuracies, false assumption, and fallacious conclusions. Moreover, many of the alleged findings of CCDI were already known to Centennial, and subject to its acquiescence, prior to the Sixth Amendment.

C.      Centennial never made any similar demands upon the Lenders' own Completion Contractor and funds control agent, Tetra Tech;

D.      Despite the fact that the Sixth Amendment expressly contemplated use of the owner's escrowed funds to satisfy existing claims of lien and to protect the Project in this manner, Centennial never once permitted use of the owner's own funds for this purpose for fear that it would dilute additional cash collateral now available to Centennial when it initiated its previously threatened foreclosure;

E.      Centennial required that Aanya escrow $1,880,855.32 to induce the release of the remaining undisbursed funds under the Construction Loan Agreement and then, intentionally and deliberately, held Aanya's own funds as ransom to comply with Centennial's extra-contractual demands.

F.      Within only a few days into the twelve (12) month extension of the construction loan, Centennial initiated a series of three (3) separate default notices, all based on alleged non-monetary technical defaults, contrary to the prior course of dealing acquiesced in by Centennial for more than one (1) year while Tetra Tech was in control of completion;

G.      Suddenly demanding compliance with AIA paperwork protocol when no such insistence had ever been imposed on Tetra Tech or any previous contractor since CCI;

H.      Immediately after execution of the Sixth Amendment, Centennial embarked on a course of dealing with Aanya that breached its duty of good faith and fair dealing with Aanya; and

I.      Immediately after execution of the Sixth Amendment, Centennial embarked on a course of dealing which deliberately and intentionally disregarded the status and demands of the project, which it had acquiesced in creating, by imposing new and immediate demands.

60.     Plaintiff Aanya relied upon Centennial's stated intent to honor the Sixth Amendment when Aanya executed same.

61.     Because of its fraudulent intent, *ab initio*, Centennial in fact has refused to perform material obligations under the Sixth Amendment, including the obligations of allowing Aanya to use its own escrowed funds to pay for satisfaction of liens and ongoing construction work.

62.     As a result of Centennial's fraud in connection with the Sixth Amendment, Aanya has sustained damages, including, but not limited to, the loss of use of the $949,968.95 deposited by Aanya into escrow in reliance upon Centennial's fraudulent representations and promises, the impacts to the Project, and possible loss of the completed value of the Project by virtue of Centennial's *de facto* confiscation of Aanya's funds and failure to provide the funding of the remaining sums in the existing Centennial loan, lost profits due to delays in funding the completion of the Project, increased Project costs, increased loan costs, and other damages as allowed by law.

WHEREFORE, plaintiff Aanya demands judgment against defendant Centennial for damages, prejudgment interest, and taxable costs.

## COUNT II
### (Cancellation and Rescission)

63.     Plaintiff Aanya realleges the allegations of paragraphs 2 – 56 and 58-61 above and incorporates them by reference herein.

64.     This is an action in equity for cancellation and rescission of the Sixth Amendment on the grounds of fraud in the inducement and the amount in controversy exceeds the sum of $15,000.

65.     By reason of Centennial's fraud in the inducement in connection with the execution of the Sixth Amendment, as more fully alleged above, plaintiff Aanya is entitled to entry of an order cancelling and rescinding the Sixth Amendment.

66.     By letter dated April 25, 2017, a copy of which is attached as Exhibit "E", Aanya notified Centennial of the rescission of the Sixth Amendment for the reasons already alleged.

67.     Plaintiff Aanya has no adequate remedy at law to obtain a cancellation and rescission of the Sixth Amendment and other supplementary relief including restitution.

WHEREFORE, plaintiff Aanya demands judgment against defendant Centennial for cancellation and rescission of the Sixth Amendment, voiding any purported releases of claims or waivers of defenses contained therein, and requiring restitution to Aanya of all sums paid to Centennial in reliance upon its fraudulent representations and expressly releasing any restrictions on any Aanya's remaining escrowed funds.

## COUNT III
### (Breach of Construction Coordination Agreement)

68.     Plaintiff Aanya realleges the allegations of paragraphs 1 – 56 above and incorporates them by reference herein.

69.    Defendant Centennial breached the Coordination Agreement in the following respects:

A.    By failing to exercise good faith and due diligence in resolving the issues created by the defaults of CCI and Tetra Tech;

B.    By failing to exercise good faith and due diligence in resolving the issues created by the material interruption of construction of the Project resulting from Tetra Tech's default;

C.    Even if Aanya was in some default under any of the technical terms of the loan documents, which Aanya denies, by failing to exercise good faith and due diligence in resolving those issues to the end that the Project could be completed and a certificate of occupancy issued in due course;

D.    By failing to timely fund the entirety of its construction loan and to manage its relationship with Mercantile and Aanya in such a way that resulted in the SBA honoring its commitments;

E.    By failing to reasonably cooperate with Aanya and Mercantile in the recommencement of the Project after Tetra Tech's default.

70.    Notwithstanding the Sixth Amendment's purported waiver or cancellation of the Coordination Agreement, that purported cancellation and waiver is avoided by defendant Centennial's fraud in the inducement in connection with the execution of the Sixth Amendment and also by virtue of the absence of Mercantile's consent to any cancellation or rescission of the Coordination Agreement.

71.    As a proximate result of defendant Centennial's breach of the Coordination Agreement, plaintiff Aanya has been damaged including, but not limited to, the loss of use of the $949,968.95 deposited by Aanya into escrow for completion of the Project, the impacts to the

Project, and possible loss of the completed value of the Project by virtue of Centennial's *de facto* confiscation of Aanya's funds and failure to provide the funding of the remaining sums in the existing Centennial loan, lost profits due to delays in funding the completion of the Project, and other damages as allowed by law.

WHEREFORE, plaintiff Aanya Hospitality demands judgment against defendant CCI for damages, including but not limited to loss of business revenue, prejudgment interest, and taxable costs.

**COUNT IV**<br>**(Breach of Implied Duty of Good Faith and Fair Dealing)**

72.    Plaintiff Aanya realleges the allegations of paragraphs 1 – 56 above and incorporates them by reference herein.

73.    In exercising its contractual rights under the Construction Loan Agreement, modified by the Sixth Amendment, and the Coordination Agreement, Centennial owed Aanya a duty to act in good faith in the exercise of any matters entrusted to Centennial's discretion.

74.    Defendant Centennial breached its implied duty of good faith to Aanya in various ways described above, and including but not limited to the following:

A.    Imposing unreasonable and arbitrary deadlines for providing construction documents and other records to its newly-appointed inspectors despite access to these records from its own agents and co-lenders;

B.    Imposing a "Deficiency Deposit" requirement in the Sixth Amendment and then immediately, after execution of the Sixth Amendment, manufacturing grounds to increase the amount of the Deposit as condition to any disbursements from the escrow account or to future funding from the remainder of the existing construction loan;

C.    Refusing Aanya's access to its own escrow funds for the purposes contemplated by the Sixth Amendment in total disregard of the needs of the Project and for Centennial's self interest in providing additional liquid collateral for contemplated future foreclosure action;

D.    Repeated promises to Aanya before execution of the Sixth Amendment of Centennial's intention to stand by Aanya through completion of the Project followed by Centennial's inconsistent conduct after execution of the Sixth Amendment evidencing an intent to declare any and all technical defaults available;

E.    Demanding prepayment of twelve (12) months of construction loan interest on the existing principal balance and on the yet undisbursed remaining balance of the construction loan, and then within a few days after obtaining those funds, creating paperwork defaults as a pretext for retaining those prepaid sums;

F.    Failing to exercise good faith and due diligence in resolving issues caused by material interruptions in the construction or defaults of the contractor or borrower in that Centennial's actions were calculated to defeat rather than promote completion of the Project as contemplated by the Coordination Agreement.

75.    As a result of Centennial's breach of its implied duty of good faith, plaintiff Aanya has sustained damages, including, but not limited to, the loss of use of the $949,968.95 deposited by Aanya into escrow for completion of the Project, the impacts to the Project, and possible loss of the completed value of the Project by virtue of Centennial's *de facto* confiscation of Aanya's funds and failure to provide the funding of the remaining sums in the existing Centennial loan, lost profits due to delays in funding the completion of the Project, and other damages as allows by law.

WHEREFORE, plaintiff Aanya demands judgment against defendant Centennial for damages, prejudgment interest, and taxable costs.

### Jury Demand

Plaintiff, Aanya, demands trial by jury as to all issues so triable herein.


DATED this 19 day of May 2017.

**LINDELL & FARSON, P.A.**

By:_____

J. Michael Lindell
Florida Bar No. 262226
Email:  mlindell@lindellfarson.com
12276 San Jose Boulevard, Suite 126
Jacksonville, FL 32223-8630
904-880-4000
904-880-4013 (fax)
E-service:  pleadings@lindellfarson.com
Attorneys for Plaintiff Aanya Hospitality, Inc.